Chicago Railway Equipment Company, Appellee, v. Anna Wilson et al., Appellants.

Gen. No. 32,671.

232

Opinion filed October 11, 1928.   Rehearing denied October 23, 1928.

WILLIAM E. RODRIGUEZ, for appellants; JOHN M. HUMPHREY, of counsel.

MUSGRAVE, OPPENHEIM & PRICE, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

In a forcible detainer proceeding, upon a second trial had in November, 1927, the court instructed the jury to find defendants guilty of unlawfully withholding from plaintiff the possession of the premises, viz, 4500 S. Robey Street, Chicago, Illinois, and, on January 21, 1928, entered judgment upon the verdict. The present appeal followed.

The action was commenced originally on December 16, 1925, against James Wilson, Sr., as sole defendant, by the filing of the usual complaint. At that time he was occupying with his family, and was in possession of, the premises, which consisted of a two-story dwelling house and some land about it. His family consisted of his wife, Anna Wilson, and their four minor children, James, Jr., John, Irene and Robert Wilson.

In January, 1926, there was a trial as against James Wilson, Sr. (hereinafter referred to as Wilson) resulting in the court instructing the jury to return a verdict in plaintiff's favor, which they did. The usual judgment against him followed, and he appealed to this Appellate Court, Case No. 30,986. On October 5, 1926, the judgment was reversed and the cause remanded for a new trial. (242 Ill. App. 640; majority opinion not published.)

The common-law record discloses that on December 4, 1926, after the cause had been redocketed in the municipal court, Wilson filed a motion to dismiss the action "for want of jurisdiction of the subject matter." The motion was accompanied by his affidavit, as follows:

"Affiant says that the controversy and issue between the plaintiff and this defendant is not merely one of right of possession of the dwelling house and the five acres of land upon which it is situated, but one of the title to said premises; that he (affiant) has been in the continuous, hostile, adverse, visible and exclusive possession of the premises, under claim of title inconsistent with that claimed by plaintiff, for a period of more than 20 years next before the commencement of this action, and during all of the time defendant, together with his family, consisting of his wife and children, has occupied the premises as his homestead, all of which is well known to plaintiff; that by reason thereof affiant is possessed of a prescriptive title to the premises, superior and adverse to the pretended title claimed by plaintiff; and that neither plaintiff nor its grantor has ever been in possession of the premises, and the same not being unoccupied lands."

The court denied the motion, and counsel for the present defendants here contend that this was error. We do not think so; (1) because defendants are in no position to raise the point, as no bill of exceptions relative to the motion is contained in the present transcript; and (2) because the action of forcible entry and detainer, under our statute, is a purely possessory civil remedy for the restitution of premises of which a plaintiff is unjustly deprived, and the right to possession is all that is involved or that can be determined. (*Shulman v. Moser,* 284 Ill. 134, 137.) In *Doty v. Burdick,* 83 Ill. 473, 475, it is said: "This court has ever uniformly held that, in an action of forcible entry and detainer, or in a forcible detainer only, the title to the premises is not involved, nor can it be inquired into on the trial." In *Thomasson v. Wilson,* 146 Ill. 384, 392, it is said: "It is no answer to say, that a detention of the premises by appellant, after demand in writing to surrender them up, was not unlawful because he entered under and held by virtue of a

superior title. What may be proved may be disproved, and if defendant be permitted to show that he entered under superior title, the plaintiff may, by evidence, overcome such proof, and thus the title be involved.''

Before a second trial was had, Wilson died on February 22, 1927, and on April 2, 1927, after notice, plaintiff appeared, suggested Wilson's death and asked that the action be revived against his heirs, the present defendants, that summons be issued, etc., and that a guardian *ad litem* be appointed, etc. On April 4th plaintiff filed an amended complaint. The only difference between it and the original was that it alleged that Anna Wilson and the four children (naming them) unlawfully withhold possession of the premises from plaintiff. On the same day summons was issued. It appears from the return of the bailiff that he served it personally upon Anna Wilson on April 7th, by delivering to her a copy thereof, together with a copy of the complaint, and that on the same day he also served it upon the four children ''by leaving a copy thereof, together with a copy of the complaint, with Anna Wilson, mother, a person of the family of said defendants, of the age of twelve years and upwards, and informing such person of the contents thereof, at the usual place of abode of said defendants in the city of Chicago.'' On April 18th, on plaintiff's motion and after notice, the court appointed Anna Wilson guardian *ad litem* for the children. At this time the oldest child, James Wilson, Jr., had reached legal age. On April 28th, the general appearance of Anna Wilson and the four children was entered by their attorney and a jury trial demanded. On November 17, 1927, Anna Wilson accepted her appointment as guardian *ad litem* for the three minor defendants, and entered her appearance. The common-law record further discloses that on November 18th, while the cause was actually on trial and plaintiff had introduced its evidence in chief, Anna

Wilson, one of the defendants, filed a written motion that the court dismiss the suit "for want of jurisdiction of the subject matter." The motion was supported by her affidavit, which is practically the same as that filed by Wilson in support of his similar motion, filed December 4, 1926. We think that the court properly denied the motion for the reasons above stated.

Defendants' counsel here contend that the death of Wilson abated the action and that the court should not have revived it. We do not think there is any merit in the contention. In section 11 of our Abatement Act, Cahill's St. 1927, ch. 1, ¶ 11, p. 46, it is provided: "When there is but one defendant in an action, proceeding or complaint, in law or equity, and he dies before final judgment or decree, such action, proceeding or complaint shall not on that account abate, if it might be originally prosecuted against the heir, devisee, executor or administrator of such defendant, but the plaintiff, petitioner or complainant may suggest such death on the record, and shall, by order of the court, have summons against such person or legal representative, requiring him to appear and defend the action, proceeding or complaint, after which it may proceed as if it had been originally commenced against him." In *St. Louis Nat. Stock Yards v. Wiggins Ferry Co.*, 102 Ill. 514, 520, it is decided that, while an action in forcible detainer under our statute is not a common-law action, "it is nevertheless an action at law, relating to real property." And in *Rutter v. Maher*, 147 Ill. App. 622, 625, it is decided that the action of forcible detainer survives as against the heirs of a sole defendant in possession of the premises at the time of his death, where, as here, it appears that his heirs succeeded him in that possession and retain it. Anna Wilson testified that after Wilson's death she and the children continued to occupy the premises and were occupying them at the time of the trial in November, 1927.

Defendants' counsel further contend that no legal service of summons was had upon the children. The argument is that the service on them, by leaving a copy of the writ and of the complaint with Anna Wilson, their mother, and a member of the Wilson family over 12 years of age, and informing her of the contents thereof, at the usual place of abode of the children, is not a sufficient service. In view of the provisions of section 48, *as amended,* of the Municipal Court Act, Cahill's St. 1927, ch. 37, ¶ 436, p. 845, and of the provisions of section 9 of the Forcible Entry and Detainer Act, Cahill's St. 1927, ch. 57, ¶ 9, p. 1329, and of the decision in *MacLean Drug Co. v. Stoeffhas,* 229 Ill. App. 492, 497–499, we do not think the contention has any substantial merit.

At the first trial in January, 1926, plaintiff's only witness was Irving D. Chandler, who for many years had been its representative in its real estate transactions, and Wilson was a witness in his own behalf. Before the time of the second trial both had died, and it was stipulated that their testimony, or parts thereof, as contained in a stenographic transcript, might be read in evidence at the second trial, subject to objections to any portions as to competency, relevancy and materiality. Much of Chandler's testimony was introduced by plaintiff without objection; portions were not admitted upon objection; and other portions properly admitted over objection. Such of Wilson's testimony as was offered was admitted without objection. We are of the opinion that the testimony was properly admitted, as on each trial the issue involved was the same between the parties or their privies, viz., the right to the possession of the premises. In *Chicago & E. I. R. Co. v. O'Connor,* 119 Ill. 586, 595, it is said: "It was entirely competent to prove, as was done, what O'Connor testified on the former trial. The issues were unchanged, in any respect, by his death. * * * And that being so, all the authorities concur

that it was competent to prove, on the last trial, what he testified to on the first.'' In *London Guarantee & Accident Co. v. American Cereal Co.,* 251 Ill. 123, 131, it is said: ''It may therefore be regarded as the settled law of this State that in order to render the testimony of a witness in a former action admissible in a subsequent action on the ground that the witness has died since giving his testimony, it must appear that both actions involved the same issue between the same parties or their privies, * * *.'' (See, also, *McInturff v. Insurance Co. of North America,* 248 Ill. 92, 94–96; *Stephens v. Hoffman,* 263 Ill. 197, 203.)

At the second trial plaintiff, in addition to introducing the testimony of Chandler and Wilson, called as a witness a surveyor, Rudolph, who testified as to a survey of the premises and other adjoining land, which he had made in 1908, and as to the particular location of the dwelling house, etc. Plaintiff also introduced a deed (dated in 1907) of certain land, including the land on which the dwelling house stands, from Thomas Carey and wife to James Miles; also a deed of the land from Miles and wife to John A. Spoor and Frederick S. Winston, trustees, upon certain trusts therein expressed, with power in the trustees, or their successors, to lease or sell any part of the land; also a lease of the premises, including adjoining land, dated July 1, 1907, from the trustees to the plaintiff, Chicago Railway Equipment Company, for a period of five years, ending July 1, 1912, with an option to purchase the same; also an instrument showing the death of one of the trustees, Winston, in 1909, and the appointment of one Leonard as his successor; and also a warranty deed, dated May 9, 1912, of said Spoor, as trustee, and Leonard, as successor in trust, conveying the premises with the other land to plaintiff. These deeds, etc., were properly introduced to show plaintiff's succession to the rights of Thomas Carey. None of them was introduced at the first trial.

From plaintiff's undisputed evidence it appears that in 1904, and prior thereto, Thomas Carey was the owner of the premises and the house. They were a part of an unsubdivided tract of about five acres, occupying the northeast corner thereof, which was south of what was then, or afterwards became, Forty-fifth Street, Chicago, and west of what was then, or afterwards became, South Robey Street. Carey then and afterwards owned other land adjoining, and operated a brickyard business. Wilson was then, and until 1909, an employee of Carey. Thereafter the house and the land upon which it stands became known as 4500 South Robey Street. Wilson's testimony on the first trial (admitted in evidence on the second) was that he lived with his family at 4500 South Robey Street, and that he and they had been living there since June, 1905,. when he was married to his wife, Anna; that in 1905, and thereafter until 1909, when the brickyard closed down, he was "barn boss" for Carey, and, when there was no work in the barn, he worked "on the dump"; that before he moved into the house in 1905, he had a talk with Carey; that Carey said: "There is the house over there for you, * * * * move in there and you can stay there, and it is yours as long as you like, and you take charge of the barn"; that he (Wilson) immediately after his marriage moved into the house and has remained there ever since; and that he "never paid any rent to anybody." Chandler's testimony on the first trial (admitted in evidence on the second) was in substance that he met Wilson and had a conversation with him on the land in 1907, about the time plaintiff had received the lease above mentioned; that Wilson said he was on the property to watch the garbage which was being dumped thereon; that he (Chandler) gave Wilson instructions as to where the loads of garbage should be put, etc.; that in 1912, after plaintiff had received the deed above mentioned, he (Chandler) had

another conversation with Wilson; that "Wilson wanted to know if he could continue in the house"; that he (Chandler) replied that he thought so, provided Wilson would continue to watch and care for the property, but that plaintiff's president would have to be consulted; that shortly thereafter he again saw Wilson and informed him that the president had said that, if he would continue to watch the property and make regular reports, he (Wilson) could continue in the house until the premises were needed or were sold; that in the year 1919 Chandler told Wilson that plaintiff was thinking of selling the property and that if the deal was consummated he would have to move; that Wilson inquired if he could not have the house and move it onto another piece of property nearby, which his mother owned; that Chandler replied that if the deal was consummated (which it was not) he would endeavor to have Wilson's request granted; that in the year 1923, while other negotiations were pending for a sale by plaintiff of the property, Chandler informed Wilson of the facts and suggested that Wilson accept a lease from plaintiff of the house, etc., for a short term, together with plaintiff's agreement to the effect that if it sold the entire property Wilson, at the expiration of the lease, might move the house off; that Wilson finally refused to sign or accept the proposed lease; that plaintiff's said other negotiations for the sale of the property came to naught, but Wilson continued to occupy the house and to watch the dumping on the property and to report to Chandler; that thereafter Chandler made frequent demands of Wilson to move out of the house but he refused to do so, and that Wilson, during the many conversations had with Chandler, never claimed that he was the owner of the premises. Plaintiff's evidence on the second trial further disclosed that on December 10, 1925, prior to the commencement of the present action, plaintiff

caused to be served upon Wilson, personally, its formal written demand for the "immediate possession of the premises, to-wit, 4500 South Robey Street, Chicago, Illinois."

We are of the opinion that plaintiff's evidence, including the testimony of Wilson, clearly discloses that Wilson entered upon the premises in 1905 as a tenant of Thomas Carey at will or at sufferance, when Carey was the owner; that plaintiff subsequently became the owner of Carey's reversionary interest or estate; that thereafter Wilson recognized plaintiff as owner of the premises, and as his landlord; that thereafter plaintiff elected to determine Wilson's tenancy, as it had a right to do; that at the time of the commencement of this action on December 16, 1925, after plaintiff's written demand for possession, Wilson unlawfully withheld that possession from it; that the present defendants, being the heirs of Wilson and remaining in possession after his death, had no greater rights to possession than he had, and that plaintiff is entitled to recover possession of the premises in this action of forcible detainer. In *Thomasson v. Wilson*, 46 Ill. App. 398, 402, it is said: "The grantee of the landlord's reversionary interest or estate, is the proper person to bring the action of forcible detainer after determination of the lease." In *Fisher v. Smith*, 48 Ill. 184, it is decided that the action of forcible detainer lies in favor of the purchaser of the fee of the demised premises from the landlord, as the grantee, in such a case, succeeds to all of the rights of the landlord, by operation of the conveyance. In *Thomasson v. Wilson*, 146 Ill. 384, 389, it is said: "But the same right to terminate the tenancy, and upon its termination to proceed for the unlawful detention of the premises, existed in the grantee as the original landlord might have exercised." It follows, we think, that the court did not err in instructing the jury to return a verdict for plaintiff and in

entering the judgment appealed from. There were no disputed facts to be passed upon by the jury.

At the second trial defendants called three witnesses, who were acquaintances of Wilson during his lifetime. They each attempted to testify to certain declarations or statements made by Wilson in their hearing to the effect that he was the owner of the house and the land on which it stood, but the court would not admit the testimony. The court did not err in the rulings, for the offered testimony was clearly incompetent and improper. Mrs. Anna Wilson, a defendant and the widow of Wilson and mother of the four children, was called as a witness. After testifying to her marriage to Wilson in June, 1905, her living in the house since that time, the character and size of the house, her meetings with Chandler and her husband's employment by Carey, she attempted to testify to a conversation which she claimed she and her husband had in 1905, shortly after they moved into the house, with a "Mr. Stahulak," and to a further conversation she and her husband had shortly thereafter with Thomas Carey, and to her thereafter paying a sum of money to Stahulak. The court would not allow the testimony to be admitted. Thereupon, out of the presence of the jury, defendants' attorney offered to prove by the witness that Stahulak called at the house, saw the witness and her husband in possession thereof, and stated to them that it belonged to him and demanded that they pay him for it, which they then refused to do; that they immediately had a conversation with Carey; and that, as a result of that conversation, they shortly thereafter again saw Stahulak and "closed the transaction with him, paid him $200 for the property and continued in possession." The court did not err in refusing to admit this somewhat extraordinary testimony. In view of the undisputed testimony of Wilson, her husband, that he entered into the possession

of the house and premises as Carey's tenant, and in view of the fact that defendants made no attempt to show who Stahulak was or that he ever had possession of the premises, and for other apparent reasons, we think that the testimony was clearly incompetent and improper. If it was sought by this testimony to show a right to possession of the premises in defendants, by a title paramount to that of Carey, Wilson's former landlord, or to that of plaintiff as Carey's grantee, they clearly could not be allowed to do so, for it does not appear that Wilson, while a tenant of either Carey or plaintiff, ever attempted to surrender his possession to either. Even in an action of ejectment, before Wilson or the present defendants could assail the title of the party, of whom Wilson was a tenant, the possession of the premises should first have been surrendered. (*Tilghman & West v. Little,* 13 Ill. 239, 242; *Lowe v. Emerson,* 48 Ill. 160, 163; *Sexton v. Carley,* 147 Ill. 269, 272.)

And we do not think that, a formal written demand for the possession of the premises having been served by plaintiff upon Wilson before the commencement of the action in 1925, it was necessary that another demand should have been served upon Anna Wilson and the children after Wilson's death. Nor do we think that the description of the premises, as stated in the complaints, viz., "4500 S. Robey Street, Chicago, Illinois," was an insufficient description, as contended. (*Szulerecki v. Oppenheimer,* 299 Ill. 68, 72.)

Our conclusion is that the judgment of the municipal court should be affirmed, and it is so ordered.

*Affirmed.*

Scanlan and Barnes, JJ., concur.